**Ann KIRKENDALL, Individually & as Personal Rep. of Estate of Dee Franklin Kirkendall, Deceased, Appellant,**

v.

**HARBOR INSURANCE COMPANY, Appellee.**

**No. 88–2696.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1989.

Decided Oct. 10, 1989.

Sam Sexton, Jr., Fort Smith, Ark., for appellant.

Robert L. Henry, III, Little Rock, Ark., for appellee.

Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge and FAGG, Circuit Judge.

HEANEY, Senior Circuit Judge.

Dee Franklin Kirkendall contracted acquired immune deficiency syndrome (AIDS) from a blood transfusion that he received during heart surgery at Sparks Regional Medical Center in Fort Smith, Arkansas. Kirkendall and his wife, Ann, commenced this action against United Blood Services (UBS) in strict liability and negligence for supplying the contaminated blood.[1] The district court granted defendant's motion for summary judgment on the strict liabili-

---

1. Kirkendall died of AIDS during the litigation's progress, and Ann Kirkendall was substituted as administratrix of his claim. Because UBS is a nonprofit corporation organized under Arizona law, the district court substituted Harbor Insurance Company, UBS's liability carrier, as a party defendant. Arkansas law immunizes nonprofit corporations from tort liability, but authorizes direct action against such a corporation's insurer as defendant in a tort action. Ark.Stat.Ann. § 23–79–210 (1987).

ty claim because an Arkansas statute treats the provision of blood as a service and does not view the blood itself as a product. Following a bench trial, the district court found in the defendant's favor on the negligence claim. Ann Kirkendall appeals, and we affirm.

## BACKGROUND

The unit of blood that Dee Kirkendall received on March 28, 1985, had been donated on March 6, 1985. That unit initially had been sent to Boone County Hospital in Harrison, Arkansas, but was returned to UBS on March 19, 1985, because it had a "shelf life" of only thirty-five days. UBS shipped the unit to Sparks Regional Medical Center in Fort Smith, its largest user of blood, on March 20, 1985. Kirkendall received the blood during surgery at Sparks Regional Medical Center on March 28, 1985. The donor of the unit of blood that Kirkendall received donated blood again on April 23, 1986, at which time his blood tested positive for AIDS. In October 1986, UBS notified Kirkendall's physician that Kirkendall may have received contaminated blood in March 1985. Kirkendall was diagnosed as having AIDS on November 2, 1986, and died on April 23, 1987.

## I.

■ Initially, Kirkendall appeals the dismissal of the strict liability claim. State substantive law governs this diversity action. Under Arkansas law, the supplying of blood for transfusions is a service rather than a product. *See* Ark.Stat.Ann. §§ 4–86–102; 16–116–102(2); 4–2–316; 20–9–802 (1987). The implied warranties of the Uniform Commercial Code therefore do not apply to blood, and blood is not a "product" for purposes of imposing strict liability in tort. *See* Ark.Stat.Ann. § 20–9–802 (1987).

■ Plaintiff contends that section 262 of the Public Health Service Act, 42 U.S.C. §§ 201–300 (1982), preempts the Arkansas statutes precluding strict liability for the furnishing of blood. The Public Health Service Act makes it a misdemeanor to transport in interstate commerce any blood or blood products prepared at a facility unlicensed by the Secretary of Health and Human Services. *Id.* § 262(a), (f). The supremacy clause of the United States Constitution operates only to the extent a conflict exists between state law and a federal law or regulation. *Gorrie v. Bowen*, 809 F.2d 508, 520 (8th Cir.1987). We find no conflict between this statute and Arkansas's limitation on strict liability for the provision of blood. The district court correctly determined that the federal statute and regulations on which plaintiff relies pertain to the licensing of blood banks, and do not preempt Arkansas tort law. *See also Abbot by Abbot v. American Cyanamid Co.*, 844 F.2d 1108, 1111 (4th Cir. 1988) (concluding that in enacting the Public Health Service Act, Congress did not expressly or impliedly intend to preempt state law). Accordingly, we affirm the district court's dismissal of Kirkendall's strict liability claim with prejudice.

## II.

■ Kirkendall next contends that UBS was negligent in failing to screen the donor of the blood unit that Kirkendall received properly for possible exposure to AIDS. Testimony at trial indicated that UBS promptly implemented all public health agency and industry recommendations regarding the screening of blood donors for exposure to AIDS. Although plaintiff suggests that UBS's failure to inquire about male donors' sexual preference or sexual contact with other males was negligent, placards posted in UBS blood donation centers and handouts given to donors clearly discouraged individuals who may have been exposed to AIDS from donating blood. Additionally, plaintiff failed to prove that specific, confrontational questioning of the donor whose blood Dee Kirkendall received would have elicited any information that would have disqualified him from donating blood. The district court correctly found that UBS's donor screening procedures did not proximately cause Kirkendall's contraction of AIDS.

## III.

■ Next, Kirkendall contends that the district court erroneously found that UBS

was not negligent in failing to test the unit with which Dee Kirkendall was transfused for antibodies to the AIDS virus. A careful examination of the chronology of events surrounding Kirkendall's transfusion, however, indicates that UBS's failure to test the unit in question was not negligent.

The medical community first reached a consensus that the AIDS virus could be transmitted through blood transfusions in 1984. *See Kozup v. Georgetown University,* 663 F.Supp. 1048, 1052 (D.D.C.1987), *aff'd in part, remanded in part,* 851 F.2d 437 (D.C.Cir.1988). On March 2, 1985, the Food and Drug Administration (FDA) licensed Abbott Laboratories to market enzyme-linked immunosorbent assay (ELISA) test kits for the detection of antibodies to the AIDS virus in donated blood. The Department of Health and Human Services had notified registered blood banks on February 19, 1985, that the ELISA test soon would be licensed. The Department of Health and Human Services encouraged blood collection facilities to begin testing donated blood as soon as the test kits became commercially available.

In October 1984, UBS issued a letter of intent to purchase 60,000 ELISA test kits from Abbott Laboratories when the test became licensed by the FDA. On March 4, 1985, UBS ordered 400 ELISA test kits from Abbott Laboratories. These kits arrived on March 13, 1985, and UBS personnel were trained in their use on March 18–19, 1985. An additional 400 test kits arrived at UBS on March 22, 1985. At that time, UBS inventory included approximately 1753 units of donated blood. UBS began testing newly-donated blood on March 23, 1985, but decided against testing blood units that it already had in inventory.

The question before us thus is whether UBS was negligent in failing to recall and test blood units in its inventory at the hospitals it serviced between March 23, 1985 and March 28, 1985. Testimony at trial showed that UBS would have needed 90 consecutive hours to recall and test the 1753 units of blood in its inventory on March 23, 1985. Of the 1753 units on hand, 193 consisted of red blood cells,

which had a shelf life of only thirty-five days. Hospitals served by UBS used 349 units of blood for transfusions from March 24 through March 27, 1985. Plaintiff contends that the limited number of ELISA test kits that UBS had following training of its personnel by Abbott Laboratories should have been allocated to the testing of the perishable red blood cells in UBS's inventory rather than to the testing of newly-donated blood. The district court concluded that only by testing all whole blood and red blood cells in its inventory and by delaying testing of newly-donated blood, could UBS have tested the blood unit that Dee Kirkendall received. Because a recall of all blood in UBS's inventory may have endangered the supply of blood available to local hospitals, the district court concluded that UBS's decision not to test inventory was reasonable in light of the foreseeable consequences. Additionally, the district court noted that plaintiff offered no proof that even if UBS had tested the blood unit that Dee Kirkendall received for antibodies to the AIDS virus, such a test would have prevented Kirkendall's transfusion with the unit of blood in question.

The district court found that the standard of care applicable to Kirkendall's claim arises from contemporaneous blood testing practices in the blood banking industry. *See Kirkendall v. Harbor Ins. Co.,* 698 F.Supp. 768, 779 (W.D.Ark.1988). The district court relied for its conclusion on *Kozup v. Georgetown University,* 663 F.Supp. 1048, 1052 (D.D.C.1987), *aff'd in part, remanded in part,* 851 F.2d 437 (D.C.Cir.1988). That case is inapposite for two reasons. First, the blood transfusion in *Kozup* occurred in January 1983, a time at which no consensus existed in the medical community regarding the transmissibility of the AIDS virus through blood transfusions. *See id.* at 1053. Second, the FDA issued a recommendation on February 19, 1985, that all blood facilities voluntarily commence testing blood for AIDS antibodies as soon as testing supplies became commercially available. Because of this recommendation, industry practice at the time of Kirkendall's transfusion does not govern UBS's conduct with respect to blood that it

had in inventory. *See Texas & Pac. Ry. Co. v. Behymer,* 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903) ("What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.") (citation omitted).

■ We believe that the FDA's recommendation of February 19, 1985, that blood facilities begin testing all donated blood as soon as testing supplies became commercially available imposed a duty on UBS to test all its blood supplies for antibodies to the AIDS virus. The chronology of events surrounding Kirkendall's transfusion, however, leads us to conclude that UBS did not breach that duty in failing to test the blood unit that Kirkendall received.

Although the blood unit in question was donated on March 6, 1985, it was held in inventory at a Harrison, Arkansas hospital, rather than at UBS's Fort Smith facility, between March 7 and March 19, 1985. The blood unit returned to UBS's facility on March 19, 1985, but was sent to Sparks Regional Medical Center on the following day. UBS personnel received training in performing the ELISA blood test on March 18–19, and UBS had only a limited number of test kits available at that time, because the test kits were on back order at their manufacturer, Abbott Laboratories. The unit of blood that ultimately was transfused into Dee Kirkendall was present at UBS's Fort Smith facility for only one day during which UBS had both the equipment and the trained personnel to perform a test for the presence of AIDS antibodies. Under these unusual circumstances, UBS's failure to recall and test the unit of blood Kirkendall received between March 23 and March 28, 1985 was not negligent as a matter of law. Consequently, we affirm.